**No. 13-55542**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

DENISE P. EDWARDS, *et al.*,

Plaintiffs-Appellants

v.

THE FIRST AMERICAN FINANCIAL CORPORATION, *et al.*,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

**REPLY BRIEF FOR APPELLANTS**

Richard S. Gordon
Martin E. Wolf
GORDON & WOLF, CHTD.
102 W. Pennsylvania Ave., Ste. 402
Towson, Maryland 21204
410 825 2300

James W. Spertus
Ezra D. Landes
SPERTUS LANDES & UMHOFER
1990 S. Bundy Dr., Suite 705
Los Angeles, California 90025
310 826 4700

Cyril V. Smith
William K. Meyer
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202-1031
410 332 0444

David A. Reiser
ZUCKERMAN SPAEDER LLP
1800 M. Street, NW
Suite 1000
Washington, DC 20036-5807
202 778 1800

Attorneys for Plaintiffs-Appellants

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ................................................................................................5

   I.    CFPB'S INTERPRETATIONS OF RESPA ARE CONSISTENT WITH ITS REGULATIONS AND HUD'S INTERPRETATIONS AND ENTITLED TO DEFERENCE...........................................................6

   II.   THERE IS NO "OVERPAYMENT" REQUIREMENT WHEN THERE IS AN EXPRESS EXCHANGE OF REFERRALS FOR A THING OF VALUE, SO VARIATIONS IN DEAL TERMS ARE IRRELEVANT TO CLASS CERTIFICATION.......................................12

   III.  WHETHER THIRD PARTIES MAY ALSO HAVE MADE REFERRALS TO FIRST AMERICAN IS IRRELEVANT TO CLASS CERTIFICATION BASED ON THE TITLE AGENCIES' CONTRACTUAL OBLIGATIONS TO MAKE REFERRALS. ...........17

   IV.  THE ABA EXCEPTION DOES NOT APPLY TO PAYMENTS *BY* FIRST AMERICAN *TO* THE CAPTIVE TITLE AGENCIES. ........21

   V.   FIRST AMERICAN IS LIABLE FOR REFERRALS FROM THE CAPTIVE TITLE AGENCIES, EVEN IF IT IS THE MAJORITY OWNER OR MANAGING PARTNER, BECAUSE THE TITLE AGENCIES ARE DISTINCT "PERSONS."...........................................23

   VI.  THIS COURT SHOULD ORDER CERTIFICATION. ..........................25

CONCLUSION ...........................................................................................28

CERTIFICATE OF COMPLIANCE.................................................................29

CERTIFICATE OF SERVICE .......................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrews v. AT&T Co.*,
   95 F.3d 1014 (11th Cir. 1996)...............................................................26

*Auer v. Robbins*,
   519 U.S. 452 (1997) ......................................................................6, 7

*Balvage v. Ryderwood Improvement & Svc. Ass'n, Inc.*,
   642 F.3d 765 (9th Cir. 2011)...................................................................6

*Carter v. Welles-Bowen Realty, Inc.*,
   2010 WL 908464, *3 (N.D. Ohio March 11, 2010)............................................27

*Carter v. Welles-Bowen Realty, Inc.*,
   736 F.3d 722 (6th Cir. 2013).................................................................7

*Chase Bank, N.A. v. McCoy*,
   131 S.Ct. 871 (2011) .......................................................................6

*Christopher v. SmithKline Beecham Corp.*,
   635 F.3d 383 (9th Cir. 2011).................................................................6

*Coleman v. Gen. Motors Acceptance Corp.*,
   296 F.3d 443 (6th Cir. 2002)................................................................26

*Decker v. NW Environmental Def. Ctr.*,
   133 S.Ct. 1326 (2013) ......................................................................7

*Edwards v. First Am. Corp.*,
   385 F. App'x 629 (9th Cir. 2010)...................................... 1, 2, 3, 4, 6, 17, 18, 20

*Freeman v. Quicken Loans*,
   132 S.Ct. 2034 (2012) .....................................................................24

ii

*In re First Alliance Mortgage Co.*,
    471 F.3d 977 (9th Cir. 2006) ...............................................................19

*K.M. ex rel. Bright v. Tustin Unified School Dist.*,
    725 F.3d 1088 (9th Cir. 2013) ................................................................6

*Lane v. Residential Funding Corp.*,
    323 F.3d 739 (9th Cir. 2003) ...............................................................14

*Schuetz v. Banc One Mortgage Corp.*,
    292 F.3d 1004 (9th Cir. 2002) ...................................................... 11, 14

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ............................................................................25

*Toldy v. FifthThird Mortgage Co.*,
    721 F. Supp.2d 696 (N.D. Ohio 2010) ...............................................23

*Univ. of Tex. SW Med. Ctr. v. Nassar*,
    133 S.Ct. 2517 (2013) .........................................................................19

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ..............................................................26

## **STATUTES**

12 U.S.C. § 2602(5) .................................................................................23

12 U.S.C. § 2602(7) .................................................................................10

12 U.S.C. § 2607(a) ...................................................................... 16, 23, 24

12 U.S.C. § 2607(b) .................................................................................24

12 U.S.C. § 2607(c)(4)(C) ........................................................................22

12 U.S.C. § 2607(d)(2) .............................................................................17

12 U.S.C. § 2607(d)(4) .............................................................................26

12 U.S.C. § 2617(a) ...............................................................................6, 8

## **RULES**

Fed. R. Civ. P. 23(b)(3).................................................................................4

## **REGULATIONS**

24 C.F.R. § 3500.14(f) ...............................................................................4

64 Fed. Reg. 10080 (Mar. 1, 1999)................................................... 11, 12

66 Fed. Reg. 53052 (Oct. 18, 2001).......................................................11

75 Fed. Reg. 36271 (June 25, 2010) ........................................... 8, 15, 18

75 Fed. Reg. 74620 (Dec. 1, 2010) ....................................................8, 9

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Discovery following the previous round of Rule 23(f) appeals confirmed that First American had violated RESPA when it struck deals for referral agreements and ownership interests with many other title agencies across the country in the same way as with the Tower City title agency. Internal company records and deposition testimony from First American's president and other company insiders established that the acquisitions were part of a national scheme to increase First American's market share by purchasing referrals—precisely the evil RESPA § 8(a) was enacted to prevent. Opening Br. 19. Thus, the evidence before the District Court on remand showed that certification of a national class of consumers who paid for First American title insurance purchased through title agencies paid for referrals was proper based on "the single, overwhelming question of fact: whether the arrangement between [those agencies] and First American violated" RESPA, *Edwards v. First Am. Corp.*, 385 F. App'x 629, 631 (9th Cir. 2010) (*Edwards I*), just as this Court held for the Tower City class.

First American's brief trumpets the Court's prior "affirmance" of the order denying certification of the national class (FA Br 1, 9), but that decision is contrary to, not support for, the District Court's denial of class certification after remand. This Court's earlier determination that the District Court did not abuse its discretion by denying national class certification was based solely on the vacuum

1

in the record resulting from First American's refusal to provide discovery and the District Court's refusal to defer ruling on class certification until such discovery had been provided. *Edwards I*, 385 F. App'x at 631. This Court would not have remanded regarding the national class if it had agreed with the District Court's view that every title agency transaction would raise individual issues precluding certification. As the CFPB's brief makes clear, here is no such "overpayment" requirement, nor was Ms. Edwards' "theory" of class certification that "First American violated RESPA's anti-kickback provision by overpaying for its ownership interest." FA Br. 1. Every transaction—including the Tower City deal—explicitly exchanged money (a thing of value) for a combination of ownership interests and a referral agreement. The precise proportion of the consideration First American paid for referrals rather than ownership interests or other elements of the deal does not matter, because in each instance referrals were part of the exchange and the payment was consideration for the whole exchange. Settlement service providers cannot exempt themselves from RESPA by combining prohibited payments for an explicit referral agreement, with payments for something else.

This Court's 2010 decision also rejected the proposition that individual proof would be required to show that referrals were made pursuant to express agreements. The Court stated explicitly that if, as alleged, Tower City "was

2

contractually obligated to refer customers to First American Title," such a contractual obligation "would be common proof of the 'action' element of a referral." *Edwards I*, 385 F. App'x at 631. That is equally true of the other agencies in the national class. Likewise, the Court rejected minimal anecdotal evidence offered to show that "'[f]rom time to time,' banks and other lenders involved in a real estate purchase pick the title insurance underwriter." *Id.* at 632. First American now offers more pieces of paper than it did with respect to the Tower City class, because there are now more agencies. But there is no more evidence regarding the relevant question—whether non-specific and occasional asserted actions by third parties negated the effect of contractually-required referrals by First American's captive title agencies—than there was before.

First American's arguments based on its declarations are contradicted and discredited by its own actions—acquiring referral agreements from the captive title agencies—and by its internal explanations for those actions: to increase its revenue and market share by capturing business that its service and prices were not sufficient to win. Only consumers who bought First American title insurance are included in the proposed class and may recover the fees they paid, so it is irrelevant if some captive title agency customers purchased other title insurance. For First American purchasers, the only question is a minimal one: whether the captive title agency "affirmatively influenc[ed]" the selection pursuant to its

contract with First American, even if others also may have influenced the choice.[1] The CFPB's brief makes clear that this is sufficient. The key point, as the Court noted in its 2010 opinion, is the contractual obligation to make referrals, which is precisely the kind of conduct justifying class certification, even in a far more difficult fraud case where both causation and reliance must be shown. *Id.* at 631 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee note).

First American engaged in a common nationwide scheme to buy referrals. That scheme violated RESPA and caused nationwide harm to consumers by perpetuating "reverse competition" for referrals rather than price or service competition benefitting consumers. The district court's decision denying certification of a nationwide class action should be reversed.

---

[1] The Court's mention in its prior opinion of a "reliance or causation" element, as distinct from the "action" element of a referral, was simply a shorthand reference to the *effect* of the "oral or written action" involved in a referral as defined in regulations published pursuant to express Congressional delegation. *See infra* § I. CFPB/HUD's regulation speaks for itself: it requires neither "reliance" nor "causation" as those terms are commonly understood. A referral means simply "'any oral or written action directed to a person *which has the effect of affirmatively influencing the selection by any person* of a provider of" title insurance. 385 F. App'x at 631 (quoting 24 C.F.R. § 3500.14(f); emphasis added).

4

**ARGUMENT**

First American has worked hard to make this case *appear* complex and potentially difficult to manage by larding the record with real and imagined factual differences among transactions through which it similarly acquired referral agreements as part of a common scheme. The need to address that factual record, and the District Court's reliance on some of it, in Appellants' opening brief should not obscure one simple truth: none of the posited factual differences matters to First American's RESPA liability. Each member of the proposed class has the same claim against First American because First American exchanged money for a deal that included a referral agreement by a captive title agency which then took "oral or written action . . . which has the effect of affirmatively influencing the selection by any person of" First American as the title insurance provider.

The elements of the common claim are: (a) the payment of a thing of value; (b) in exchange for a promise to make referrals; (c) the "action" of carrying out the referral agreement; and (d) the "effect of affirmatively influencing" the choice of settlement service provider. What this Court called the "single, overwhelming" question—whether deals for explicit referral agreements as part of transaction along with an ownership interest violated RESPA—is common to the deals First American struck with dozens of title agencies, not just Tower City (*see id.* at 631),

5

and predominates over the legally insignificant variations in deal structure and other factors rehearsed at length in First American's brief.

## I. CFPB'S INTERPRETATIONS OF RESPA ARE CONSISTENT WITH ITS REGULATIONS AND HUD'S INTERPRETATIONS AND ENTITLED TO DEFERENCE.

Congress expressly invested CFPB with the authority to interpret RESPA. 12 U.S.C. § 2617(a). Recognizing that CFPB's interpretation of the regulations implementing RESPA in an amicus brief is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), and *Chase Bank, N.A. v. McCoy*, 131 S.Ct. 871 (2011),[2] First American attempts to manufacture an interpretive "about-face" similar to the one that led this Court to disagree with the Department of Labor's position in *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 400 (9th Cir. 2011), *aff'd*, 132 S.Ct. 2156 (2012).[3] But CFPB's interpretation is entirely

---

[2]  This Court defers to a federal agency's interpretation of its regulations unless "there is reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter." *Balvage v. Ryderwood Improvement & Svc. Ass'n, Inc.*, 642 F.3d 765, 776 (9th Cir. 2011) (deferring to HUD's interpretation of regulations implementing the Fair Housing Act in an amicus brief; citation omitted); *see also K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1092, 1100 (9th Cir. 2013) (DOJ amicus brief).

[3]  In the Supreme Court, the government's brief advanced an interpretation different from the one in the Labor Department brief addressed by this Court. 132 S.Ct. at 2166 & n.14.

consistent with HUD's prior policy statements, with the language of the regulations, and with the language and purpose of RESPA.[4]

Regarding whether Ms. Edwards must show an "overpayment" for the interests acquired in each of the captive title agency transactions, CFPB's brief makes clear that First American's position is wrong. "[T]he safe harbor provisions provide only that an agreement to purchase goods, services or facilities will not be deemed to be a payment for a referral." CFPB Br. 16. But the safe harbor does not cover an explicit agreement to make referrals. *Id.* (A title insurer and appraiser "may not . . . enter into an agreement that all future business will be referred to the appraiser, regardless of whether the appraiser's services are reasonably priced."); *id.* at 17 ("Because this case concerns the lawfulness of alleged referral agreements between First American and the title agencies, it falls outside the safe harbor.").[5]

---

[4]  First American also notes that three justices of the Supreme Court have questioned the validity of *Auer*.  FA Br. 31.  But this Court is plainly bound by that decision.  *See Decker v. NW Environmental Def. Ctr.*, 133 S.Ct. 1326, 1339 (2013) (Scalia, J., concurring in part and dissenting in part) (noting that *Auer* deference was dispositive in the case, making it part of the Court's holding). Moreover, Ms. Edwards would prevail under the narrower positions presented in her opening brief as well as under CFPB's reading of the regulations.

[5]  That is another reason why the concurring opinion in an out-of-Circuit case, *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013), has no bearing here.  In *Carter*, the concurrence perceived a conflict between (a) HUD's policy statement, and (b) a statutory safe harbor, interpreted under the rule of lenity.  Here, there is no such conflict:  RESPA's safe harbor provisions cannot possibly save an explicit agreement to pay for referrals of business, as CFPB's brief makes clear.

CFPB's position that any exchange encompassing an explicit agreement to make referrals violates RESPA is consistent with HUD's own position in a 2010 interpretive rule issued pursuant to 12 U.S.C. § 2617(a). *Real Estate Settlement Procedures Act (RESPA): Home Warranty Companies' Payments to Real Estate Brokers and Agents*, 75 Fed. Reg. 36271 (June 25, 2010). Examining payments by home warranty companies (HWCs) to real estate agents, HUD concluded that compensating a real estate broker for marketing the HWCs' services to particular customers would violate RESPA, because such marketing is a referral and paid agreements to make referrals are impermissible. *Id.* at 36272. *See also Real Estate Settlement Procedures Act (RESPA): Home Warranty Companies' Payments to Real Estate Brokers and Agents Interpretive Rule: Response to Public Comments*, 75 Fed. Reg. 74620 (Dec. 1, 2010) (payments for marketing to particular homebuyers are illegal).

HUD distinguished explicit agreements to market HWCs—which were *per se* illegal—from compensation of real estate brokers for goods and services, which might or might not be considered hidden kickbacks, depending on whether the payments were actual, necessary, and distinct from the broker's primary services, and the payments were also "reasonably related to the value of those services and [do] not include compensation for referrals of business." 75 Fed. Reg. at 36273.

An individualized determination is required only when an agreement to make
referrals must be *inferred* from a payment that is not reasonable in relation to the
goods or services provided, not when there is an explicit exchange. "Referrals of
settlement service business are not compensable services," 75 Fed. Reg. at 74621,
so the "safe harbor" for goods and services does not apply to any agreement
expressly exchanging referrals for a thing of value.

CFPB's brief also explains that even taking at face value First American's
litigation position—that, contrary to internal documents basing the value of the
deals on the revenue stream from referrals, all of the money paid to captive title
agencies should be attributed only to ownership interests—the referral agreements
violated RESPA. *Id.* at 19. If, as the complaint alleges and the evidence shows,
First American conditioned its purchases on entering into referral agreements, it
exchanged a "thing of value"—the opportunity to participate in the ownership
transaction, essentially an option—for the referral agreement.[6] *Id.*

There is nothing esoteric or controversial about that. Suppose a wireless
service provider offers a "free" cellphone with a two-year service contract.
Although the telephone is ostensibly "free," the opportunity to acquire the

---

[6] First American argues (FA Br. 51 & n.7) that Plaintiffs did not claim that First
American "conditioned" its deals on referral agreements. Not so: Plaintiffs' 2011
class cert. motion, ECF 234 at 3, presented the testimony of First American's
President, Parker Kennedy, that "most of the time," the company "insist[ed] on" an
"exclusive underwriting agreement" when it bought less than a 100% interest in a
title agency. (Further Excerpts of Record ("FER") 1.)

cellphone depends on entering into the service contract; the wireless carrier will not *give away* the "free" cellphone. That is an exchange of a thing of value for the telephone. By the same token, it is obvious that the telephone in this hypothetical is not really "free," but rather part of the consideration paid for cellular services. The same is true of the referral agreements included in the purchase agreements.

CFPB also debunks First American's arguments about the significance of additional referrals by third parties. "[N]othing in the statutory text limits liability to instances in which the unlawful referral is the only referral the consumer received or the one that 'precisely influenced' (E.R. 8) the consumer's selection of settlement service provider." *Id.* at 21. Indeed, 12 U.S.C. § 2602(7) describes situations in which an affiliate of a service provider "directly or indirectly refers such business to that provider *or* affirmatively influences the selection of that provider," demonstrating that the regulation defining referrals is properly interpreted to include actual referrals in addition to actions that otherwise "affirmatively influence" the selection of a provider. *Id.* at 23-24 & n.13.

In an effort to conjure up a reliance interest similar to the pharmaceutical industry's reliance in *Christopher* on the Department of Labor's longstanding treatment of sales representatives, First American sets up a false dichotomy between HUD's interpretation of RESPA and CFPB's *amicus* brief. FA Br. 32. But HUD's 1999 and 2001 policy statements about yield spread premiums paid to

mortgage brokers have nothing to do with express agreements to make referrals. *See Real Estate Settlement Procedures Act (RESPA) Statements of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers,* 64 Fed. Reg. 10080 (March 1, 1999); *2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b)*, 66 Fed. Reg. 53052 (Oct. 18, 2001).

The issue HUD addressed in these policy statements was whether yield spread premiums were *per se* illegal kickbacks, or whether the legality of the payments depended on the circumstances, and specifically on whether there could be explanations for the payments *other than* kickbacks.[7]  64 Fed. Reg. at 10084.  In other words, the policy statements were about how to determine whether there had been an implicit referral agreement, not about whether any portion of an exchange could be attributed to the explicit referral agreement.  *See Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1013 (9th Cir. 2002) ("[T]he second prong [of the HUD policy statement] requires that the total compensation, including the YSP if it is a component, be in the ballpark.  If it isn't, then regardless of whether there is a YSP or the YSP is high or low, an illegal referral may be inferred.").  HUD concluded that such payments *could be* for compensable goods and services, and

---

[7]  HUD issued the policy statements in response to a specific congressional directive "to clarify its position on lender payments to mortgage brokers."  64 Fed. Reg. 10080.  The "coverage of this statement is restricted to payments to mortgage brokers in table-funded and intermediary broker transactions."  *Id.* at 10081.

therefore rejected the inference that the payments were necessarily for referrals. 64 Fed. Reg. at 10085. Courts, including this Court, have looked to the HUD policy statements to decide when it is generally appropriate to infer that a payment, or a portion of a payment, is for a referral of settlement business.

Unlike yield spread premiums, the legality of First American's *explicit* agreements does not depend on drawing an inference by excluding other explanations (showing that the payment is not "reasonably related" to such goods or services). The illegal referral agreements here are plain on their face. There is no need to draw any inference of a referral agreement from the disproportionality of a payment and the good or service ostensibly exchanged for it.

First American's argument that the Court should ignore those express referral agreements, and attribute all of the consideration paid for ownership interests and referrals to the ownership interests alone, has nothing to do with the HUD policy statements. This Court should defer to CFPB's interpretation of RESPA, just as it previously deferred to HUD's interpretation in *Schuetz.*

## II. THERE IS NO "OVERPAYMENT" REQUIREMENT WHEN THERE IS AN EXPRESS EXCHANGE OF REFERRALS FOR A THING OF VALUE, SO VARIATIONS IN DEAL TERMS ARE IRRELEVANT TO CLASS CERTIFICATION.

First American insists, and convinced the District Court, that the legality of deals in which it paid money to acquire both ownership interests and promises to make referrals depends on whether Ms. Edwards can prove, for each transaction,

that the payment exceeded the value (as determined through some retrospective appraisal) of the ownership interests. As Ms. Edwards' opening brief pointed out, that argument is contrary to two fundamental points, one factual and one legal. The undisputed factual point is that First American's deals included both ownership interests and referrals, and its internal documents show that the referrals were more important to First American in valuing the deals than the possible dividend payments it might receive as an owner.[8] First American's insistence on referral agreements (FER 1) as part of the deals refutes its litigation position that it attributed no value to the referrals. First American cannot create factual disputes about the value of all the things it paid for (the definition of their "fair market value") with retrospective appraisals, using admittedly different and imprecise methods of valuation.

---

[8] First American contends (FA Br. 17) that one of the 38 title agencies, Attorneys Title LLC, had no exclusive underwriting agreement, citing a document (SER 25) that it did not produce in discovery but filed only in opposition to the motion for class certification. The parties agreed to remove other agencies from the class list, Add. 1-1 to 1-3, and Ms. Edwards declined to remove Attorneys Title because an internal First American memorandum (FER 3) demonstrated that the company *had* entered into such an agreement, and First American had not produced the actual contract. FER 7. Elimination of Attorneys Title LLC from the class list on the basis that it did not agree to make referrals would have no bearing on any issue in this appeal. First American cites some agreements for other agencies that did not require referrals during part of the class period, but all of those agencies were covered by First American referral agreements for some portion of the class period.

The settled legal point is that—as a matter of settled contract law—First American's payment was consideration for both ownership interests and referrals.[9] For both reasons, First American plainly exchanged a thing of value (money) for referrals.

Instead, First American makes two arguments in support of an overpayment requirement. First, it attributes the overpayment requirement to Ms. Edwards herself. Although the complaint alleged that First American paid more for the Tower City Title Agency than it was worth, that was not the basis for the RESPA claim. That was clear from the Ms. Edwards' class certification submissions to the

---

[9] First American (at 50) quotes out of context a statement from *Lane v. Residential Funding Corp.*, 323 F.3d 739, 744 (9th Cir. 2003), that RESPA prohibits only "payments that are for nothing else than the referral of business." First American argued *Lane* on the "overpayment" issue before, 2008 ECF at 47-8, and this Court implicitly rejected the argument in ruling for Ms. Edwards. But even if this Court wished to revisit the matter, *Lane* is not relevant here. *Lane* was a case with no explicit, let alone written, referral agreement. The Court held that when a thing of value such as discounted fees is exchanged for a legitimate item such as reduced costs, the court must assess the fit between the discounts and the reduced costs using the "reasonable relation" standard adopted in *Schuetz v. Banc One*, *supra*, to decide whether the discount may also be attributable to referrals (in the absence of an actual agreement such as exists here). The second step in the analysis—the "reasonable relation" test—would be pointless if, as First American claims, RESPA barred only agreements that addressed "nothing else" besides referral of business. The first step in the analysis—that something else was involved—would end the inquiry. Thus, the "nothing else" statement was actually *dictum* inconsistent with the Court's holding.

District Court and to this Court in the prior 23(f) appeal, and the 2010 oral argument before this Court. Certainly any confusion First American may have had was dispelled when Ms. Edwards petitioned for rehearing in 2010, asking the Court to clarify for the District Court on remand that an overpayment was not required. Ms. Edwards' submissions in support of national class certification on remand expressly disclaimed an overpayment theory. *See* ECF 277 at 2-4.

Second, First American relies (at 47) on inapposite cases addressing the same question HUD considered when it issued the policy statements on mortgage yield spread premiums: how does a court decide whether a payment is actually a kickback (or includes a kickback) when there is no explicit agreement to make a referral? As explained above, the HUD policy statements, adopted by this Court for that purpose, look to whether the deal (a) includes goods or services; and (b) reasonably related to the value of those goods and services. The rationale for that test is that if there is no reasonable relation between payment and value, then it is fair to infer an agreement to pay for referrals even though no written agreement exists. *See also* 75 Fed. Reg. at 36272 (HUD policy statement regarding payment by home warranty companies to real estate brokers looks to whether compensation is reasonable, which "would not be an indicator of an unlawful referral arrangement and would be permissible."). The question is how to prove the "agreement" element of RESPA (whether an agreement exists), not how to prove

15

the "thing of value" element (whether a payment is consideration for an agreement).

First American protests that Ms. Edwards cites no authority for her position (FA Br. 47), but the authority that matters here is the plain language of RESPA and the regulations implementing the statute. First American does not even bother to address the statutory language, which forbids any exchange of a thing of value for an agreement to make referrals.[10] That prohibition applies to a contract for ownership interests and referrals just as much as it would apply to a single $100 payment expressly made for both a referral and for some good or service.

First American argues that the analysis should be different for twelve newly-formed entities ("Newcos"), but even if that were true, the District Court should have certified the nationwide class except for Newco customers, and provided Ms. Edwards with an opportunity to identify a suitable representative of a Newco subclass, rather than denying certification across the board.

---

[10] 12 U.S.C. § 2607(a): "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

**III. WHETHER THIRD PARTIES MAY ALSO HAVE MADE REFERRALS TO FIRST AMERICAN IS IRRELEVANT TO CLASS CERTIFICATION BASED ON THE TITLE AGENCIES' CONTRACTUAL OBLIGATIONS TO MAKE REFERRALS.**

For the Tower City class, this Court determined that an affidavit averring that "'[f]rom time to time,' banks and other lenders involved in a real estate purchase, not the title agent, pick the title insurance underwriter" was "plainly insufficient to show that class members are not similarly situated," *Edwards I*, 385 F. App'x at 632, when Tower City agreed by contract to make referrals.

First American now argues that individual inquiries would be required to determine whether a referral was made, or whether First American was chosen as the title insurance underwriter by a third party such as a lender, real estate agent, or closing attorney. FA Br. 20-23. The District Court agreed, posing the question, "Did the referral agreements result in the class members choosing FATIC as their title insurance underwriter?" ER 8.

That is not the standard. Although First American is liable under RESPA's private right of action, 12 U.S.C. § 2607(d)(2), only if the customer actually paid for First American's title insurance (not insurance issued by some other underwriter), the statutory violation is complete when the paid-for referral to First American is made, not when the consumer makes the selection of title insurance underwriter. *See* CFPB Br. 21. Regulations adopted by HUD and ratified by CFPB define referral to "include[e] any oral or written action directed to a person

17

which has the effect of affirmatively influencing" the selection of a settlement service provider.  First American does not challenge that regulatory definition in any respect, and this Court applied the definition in its 2010 opinion.  *Edwards I*, 385 F. App'x at 631.

"Influence" is not the same as causation.  An action can have "the effect of affirmatively influencing" a choice even if there is also a concurrent influence on, or even a completely independent cause for, the choice.  Many factors many *influence* a decision even if no single factor can be isolated as a "but for" cause of the decision.  (Fellow Cubist Georges Braque "affirmatively influenced" Picasso's style, but did not cause it.)  Like real estate brokers, title agencies conducting settlements for which they prepare documents and hold funds in escrow "hold positions of influence in the real estate transaction," 75 Fed. Reg. at 36272. Actions by those who wield such influence are prohibited referrals, even if those actions are not the only reason the consumer chooses a settlement service provider. Consequently, the possibility that others also referred consumers to First American does not create a factual dispute about whether a title agency made a referral pursuant to its contractual obligation.

This Court's reference in its 2010 decision to "[t]he reliance or causation element," *Edwards I*, 385 F. App'x at 631, was not a rigorous analysis of the

18

regulation (as requiring causation, or reliance, or both).[11]  Rather, it was a

shorthand description connecting the elements of RESPA liability to the causation

and reliance elements of fraud discussed in the 1966 advisory committee note to

Rule 23.  Because class certification is appropriate even when causation and

reliance are required, if there is a common pattern, this Court observed that the

principle underlying the advisory committee note applies to RESPA cases with

equal force.  *See In re First Alliance Mortgage Co.,* 471 F.3d 977, 990 (9th Cir.

2006) ("this court has followed an approach that favors class treatment of fraud

claims stemming from a 'common course of conduct.'").

　　　　The evidence of third party referrals is also just as flimsy for the national

class as it was for the Tower City class in the previous appeal.  As explained in Ms.

Edwards' opening brief, the declarations relate to only fifteen of the title agencies.

Opening Br. 25.  None of the declarations purports to relate directly to any actual

transaction that is at issue in this case.  The declarations show only that other real

estate professionals occasionally chose the captive title agencies to provide closing

services *and* First American title insurance—not that they made referrals to First

---

[11]  "Affirmatively influence" may fairly be categorized as a "lessened" causation
standard.  *See Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)
(retaliation prohibited under Title VII if it is a "motivating factor" but not shown to
be the cause of employment action).  Congress did not require that the referral
*cause* the selection of the settlement service provider because the harm it wanted to
prevent was the making of a referral by a real estate professional in a position of
trust that is tainted by a conflict of interest arising from a payment.

American *independent* of the particular title agencies.[12]  As a result, the

declarations simply confirm First American's strategy of tapping into referral

networks.  *Id.* 26-28; FA Br. 20-23.  Consequently, even if this Court deemed the

declarations legally relevant, they are "plainly insufficient to show that class

members are not similarly situated."  385 F. App'x at 632.

Evidence that some of the captive title agencies also issued title insurance

policies for other underwriters does not affect First American's liability for the

referrals the agencies *did* make to First American.  *See* FA Br. 18.  If the agency

referred a customer to another underwriter, the customer has no claim against First

American, and is not a member of the proposed class.  For the same reason, the

fact that First American may have excused certain violations of exclusivity

agreements by two agencies (Equity NV and Orange Coast) after this suit was filed

and the legality of the agreements had been called into question, or made other

limited exceptions, does not mean that the referrals made to First American by

---

[12]   First American's brief shows a lack of understanding of the industry.  First
American deems it "sophomoric" that the declarations "discuss a third party's
reasons for influencing the selection of a FATIC *agent*, rather than First American
itself."  FA Br. 39.  The point, as explained in Ms. Edwards' opening brief at pp.
11-13, is that title agencies do much more than issue title insurance policies.  Such
agencies facilitate the real estate closing by preparing documents, providing a
venue for the execution of the documents (the "closing table"),  and holding funds
in escrow.  The declarations attest to the efficiency of some of the captive title
agencies in performing those distinct roles, making them attractive targets for First
American's acquisition of referral agreements.  The choice of a title agency does
not imply an overriding preference for a particular title insurance underwriter.

those agencies pursuant to their agreements can be ignored as uncompensated. *See* FA Br. 19.

First American's agreements generally used standard language forbidding the captive title agency from issuing policies for First American's competitors unless (a) the customer specifically requested a different title insurance underwriter; (b) the other underwriter made a referral to the title agency; or (c) First American refused to underwrite the policy.[13] The Tower City agreement had the same exceptions. Although there were no numerical limits on the number of such policies, the exclusivity clauses were written to maximize the number of referrals to First American—everything that could be referred without alienating a customer or referral source. Winning business in that way is just what Congress wanted to stop by enacting RESPA.

## IV. THE ABA EXCEPTION DOES NOT APPLY TO PAYMENTS *BY* FIRST AMERICAN *TO* THE CAPTIVE TITLE AGENCIES.

First American asserts that 14 of the 38 agencies were affiliated business arrangements (ABAs). The ABA exception was enacted to regulate the then-

---

[13] The "Exclusivity Provision Language" column of First American's own "Summary of Evidence in Opposition to Plaintiff's Motion for Class Certification" (ER 54-65), confirms the similarity of the exclusivity provisions. In some instances, the contract made no exceptions to exclusivity, while in others the title agency was obligated to refer a "majority" (ET Investments, LLC) or other percentage (Accurate Title, 100-90%; California Title, 90%; Equity Land Title, 95%; Everest National Title, 75%; Island Title, 90%; Orange Coast, 95-80%; Title Xperts, 90%). All of the agreements thus required the captive title agencies to make referrals to First American.

common practice by which real estate professionals (typically real estate agents) in a position to refer their clients to other settlement service providers would invest in a local title agency and steer customers to that affiliated agency. Because Congress perceived certain potential consumer benefits to allowing such arrangements (by bundling services), Congress carved out an exception to the prohibition on referral payments *by* entities owned by referral sources, *to* their owners, subject to certain mandatory conditions.

One of those requirements was that the payment be a proportional return on the ownership interest. 12 U.S.C. § 2607(c)(4)(C) ("the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship"). That is, the title agencies were allowed to make payments to the owners who were making referrals to the agency, proportional to their ownership stake. First American's payment *to* a title agency to buy an ownership stake is not a *return* (by the title agency to First American) on an ownership interest. The problem is not whether there is or is not evidence of proportionality (*see* FA Br. 54), but rather that the direction of the payment is the exact opposite of what is permitted by the ABA exception. The ABA exception allows certain payments by the owned firm to its owners. First American's payments were by an owner to the owned firm.

Because the ABA exception does not apply as a matter of law, it is irrelevant whether in any particular customer transaction the ABA relationship was disclosed. *See* FA Br. 53-54.[14]

## V. FIRST AMERICAN IS LIABLE FOR REFERRALS FROM THE CAPTIVE TITLE AGENCIES, EVEN IF IT IS THE MAJORITY OWNER OR MANAGING PARTNER, BECAUSE THE TITLE AGENCIES ARE DISTINCT "PERSONS."

First American does not contend that any of the title agencies were divisions of First American, rather than distinct legal persons. Thus, a referral by the title agency to First American violates the statutory prohibition: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business . . . shall be referred to any person." 12 U.S.C. § 2607(a). First American is a "person" which gave a thing of value to the title agency, and that agency is a different "person" which accepted the payment to refer settlement business to First American. *See* 12 U.S.C. § 2602(5) (defining "person"). It is legally irrelevant that First American is the majority owner or managing member of some of the agencies.

First American off-handedly suggests that the Court should disregard *Toldy v. FifthThird Mortgage Co.*, 721 F. Supp.2d 696 (N.D. Ohio 2010), rejecting a

---

[14] As to "required use"—another ABA condition—First American points to only one of the 14 ABAs where it claims use was *not* required, contrary to its written agreements with the agencies. FA Br. 54. More to the point, customers who were not required to use First American—and did not use it—are *not in the class*, by definition.

similar argument, because of the Supreme Court's subsequent decision in *Freeman v. Quicken Loans*, 132 S.Ct. 2034 (2012). FA Br. 56. But *Freeman* has nothing to do with the issue here. In *Freeman* the Supreme Court decided whether a RESPA provision not involved in this case, 12 U.S.C. § 2607(b), could be violated by charging too much for a real estate settlement service without an actual split of the fee between two distinct persons.[15] The Court held that there could not be a "portion, split or percentage" of a charge unless it was divided between two entities. That has nothing to do with whether majority ownership or managing authority make two entities legally identical for purposes of 12 U.S.C. § 2607(a). If, as First American seems to contend (FA Br. 56), two agencies, Johnson County and Equity Title, actually ceased to have a separate legal existence, proving that should be a straightforward matter of public corporate records that should not affect the predominance of common issues.[16]

---

[15] "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

[16] First American argues that Island Title was majority-owned by First American and staffed by First American employees. FA Br. 56. But the declaration First American cites shows that the head of the agency also reported to his board, confirming that Island Title remained a separate entity. ER 138.

## VI.    THIS COURT SHOULD ORDER CERTIFICATION.

The time has come for a clear direction to the District Court to certify a national class, just as this Court ordered certification of the Tower City class in 2010. Ms. Edwards filed her complaint in 2007 to correct a serious flaw in the market for title insurance. First American stymied class certification by refusing to provide discovery other than about Tower City, and this Court remanded. The record before the District Court showed a common national scheme substantially the same as Tower City. The District Court's reasons for concluding that common issues do not predominate over individual issues are erroneous, as shown above and in Ms. Edwards' opening brief. First American does not dispute that the District Court considered the other Rule 23 requirements for certification of a national class (adequacy of representation and ascertainability) in conjunction with its rejection of First American's motion to de-certify the Tower City class. *See* Opening Br. 53-54. Consequently, there is no *discretionary* basis for denying national class certification, and no reason for this Court to defer to the District Court about whether certification is appropriate. First American is not entitled to prevail by exhausting the plaintiff on a treadmill of certification proceedings.

Ms. Edwards sought class certification in the District Court and addressed each Rule 23 requirement. *Singleton v. Wulff*, 428 U.S. 106 (1976), is inapposite for many reasons, the most basic of which is that the District Court should have

addressed all of the Rule 23 factors. The District Court's decision not to address certain requirements that were fully briefed, ripe for decision (and two of which it addressed in a separate order issued the same day) cannot operate as a kind of pocket veto on class certification.

First American argues that Ms. Edwards has not shown that a class action would be superior to individual actions. It argued the same thing in 2008, and this Court rejected it then. Opening Br. 55-56. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996), cited by First American, did not hold that individual actions should be preferred just because they are, theoretically, plausible. The courts in *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443 (6th Cir. 2002), and *Andrews v. AT&T Co.*, 95 F.3d 1014 (11th Cir. 1996), rejected certification for other reasons, and considered the feasibility of individual actions only as a circumstance that might have compelled certification notwithstanding those other grounds. Neither decision suggests that the infeasibility of individual suits is a Rule 23 requirement. Even if the availability of attorneys' fees makes individual RESPA actions feasible, it would be unconscionably wasteful of judicial resources to hold thousands of individual trials about the same national scheme to buy referrals.

The availability of government enforcement (for injunctive relief under 12 U.S.C. § 2607(d)(4)) is not relevant to class certification. Rule 23 is concerned

26

with whether private civil actions should proceed as a class or as individual cases, not with whether government enforcement should eclipse a private right of action. First American's "See, e.g." cite (at 60) to an unpublished district court opinion implies that there are many cases holding "[i]n part" that the availability of government enforcement precludes a superiority determination. But *Carter v. Welles-Bowen Realty, Inc.*, 2010 WL 908464, *3 (N.D. Ohio March 11, 2010), states only that, "[g]overnment enforcement also undermines Plaintiffs' argument that private class actions are a superior means for adjudicating RESPA cases," citing another opinion issued in the same district which itself cites nothing.

If either the availability of a fee award for an individual case or government enforcement ruled out class certification, there could never have been a proper employment discrimination class action, despite the many such cases that have been certified by this and other courts. Title VII makes an award of fees available to assure that individuals are represented, and the EEOC has the power to sue and even to collect damages (unlike CFPB which may only seek injunctive relief under RESPA). So a ruling that a class cannot be superior if fees or government enforcement are available would have a dramatic effect, not only on other consumer protection laws, but also throughout the legal system.

Congress enacted both a private remedy which imposes monetary consequences for past violations of RESPA and public injunctive remedies.

Relying solely on prospective relief would encourage firms like First American to violate RESPA in the hopes of charging supra-competitive prices for many years before a government agency decides to allocate limited resources to investigating and pursuing the firm's illegal conduct.

## **CONCLUSION**

The order denying certification of the national class should be reversed and the class should be certified.

DATED:  April 4, 2014                                   Respectfully submitted,


ZUCKERMAN SPAEDER LLP


/s/ Cyril V. Smith
Cyril V. Smith

Richard S. Gordon                                   William K. Meyer
Martin E. Wolf                                      ZUCKERMAN SPAEDER LLP
GORDON & WOLF, CHTD.                                 100 East Pratt Street, Suite 2440
102 W. Pennsylvania Ave., Ste. 402                  Baltimore, Maryland 21202-1031
Towson, Maryland 21204                              410 332 0444
410 825 2300                                        csmith@zuckerman.com

James W. Spertus                                    David A. Reiser
Ezra D. Landes                                      ZUCKERMAN SPAEDER LLP
SPERTUS LANDES & UMHOFER                            1800 M. Street, NW
1990 S. Bundy Dr., Suite 705                        Suite 1000
Los Angeles, California 90025                       Washington, DC 20036-5807
310 826 4700                                        202 778 1800

*Attorneys for Plaintiffs-Appellants*

28

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Appellate Rule 32(a)(7)(B) because it contains 6,999 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). The undersigned has relied upon the word count feature of the word processing system in preparing this certificate. The brief has been prepared in proportionally spaced Times New Roman font, point size 14, using Microsoft Office Professional Plus 2010, Version 14.0.4760.1000 (32 bit).

/s/ Cyril V. Smith

| 9th Circuit Case Number(s) | 13-55542 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Apr 4, 2014 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)   s/ James W. Spertus

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)